CONSOLIDATED WINDOW GLASS CO. v. WINDOW GLASS MACH.
CO. et al.*

(Circuit Court of Appeals, Third Circuit.	October 13, 1919.)

Nos. 2443-2447.

1. PATENTS ☞54, 173—VALIDITY AS AFFECTED BY PRIOR PATENTS.
   Patents for a machine and process for drawing glass for windows mechanically are not anticipated by patents for earlier and abortive devices and methods, where the patents in suit were the first that were successful, and such patents must be given a broad and liberal construction; the inventors being pioneers in the art.

2. PATENTS ☞328—FOR DRAWING WINDOW GLASS VALID AND INFRINGED.
   The Lubbers patent, No. 702,013, claims 1, 2, 3, 5, 8, 9, 10, 12, 13, 15, 16, 17, and 18, as well as patent No. 702,014, claims 2, 3, 4, 5, 8, 9, 11, and 13, the first of which was for an apparatus for mechanically drawing window glass and the latter being a method patent, held valid and infringed.

3. PATENTS ☞328—FOR MECHANICAL DRAWING OF GLASS VALID AND INFRINGED.
   The Lubbers divisional patent, No. 702,015, which showed the use, in connection with his shield in the forehearth, of floating rings, all of which apparatus was used for the mechanical drawing of glass, held valid and infringed.

4. PATENTS ☞328—FOR DRAWING GLASS VALID AND INFRINGED.
   The Lubbers patent, No. 886,618, for an air vent hole in the apparatus for mechanically drawing glass, claims 20, 21, 23, 24, and 26, held valid and infringed.

5. PATENTS ☞328—IMPROVEMENT OF PATENT FOR DRAWING GLASS VALID AND INFRINGED.
   The Lubbers patent, No. 886,618, for an air vent hole in the apparatus mechanically drawing glass, the application for which was filed May 21, 1903, and which was granted May 5, 1908, after the patentee at the suggestion of the Patent Office later made a divisional application of that patent, applying for patent No. 1,020,920, and filing nearly three years later additional claims for his original patent, held valid; it appearing that the whole art was in a state of flux and experiment, and it being impossible to say with definiteness that Lubbers had satisfactorily worked out the open vent solution more than two years in advance of his application.

6. PATENTS ☞328—FOR IMPROVEMENT OF METHOD OF DRAWING GLASS VALID AND INFRINGED.
   The Chambers patent, No. 762,880, for a method for gradually increasing the speed of the drawing operation for the mechanical drawing of glass, held valid and infringed.

7. PATENTS ☞328—REGULATING SPEED OF DRAWING GLASS VALID AND INFRINGED.
   The Lubbers patent, No. 822,078, for a method of regulating the speed for the mechanical drawing of glass, held valid and infringed.

8. PATENTS ☞328—REGULATING DRAWING OF GLASS VALID AND INFRINGED.
   The Lubbers patent, No. 914,586, for an appliance to regulate the mechanical drawing of glass, so that the surface tension on the bait would be equalized, held valid and infringed.

9. PATENTS ☞328—FOR CAPPING GLASS CYLINDERS VALID AND INFRINGED.
   The Hitner patent, No. 821,361, for a device for capping off glass cylinders, held valid, despite the contention that it had been placed on sale more than two years before application, and also held infringed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari denied 251 U. S. ——, 40 Sup. Ct. 179, 64 L. Ed. ——.

10. PATENTS ☞328—FOR HOISTING DEVICE VALID AND INFRINGED.

The Hitner patent, No. 822,452, for a hoisting device to move large cylinders of glass mechanically drawn, *held* valid and infringed.

11. PATENTS ☞328—FOR HOLDING GLASS CYLINDERS VALID AS TO CERTAIN CLAIMS.

The Bridge patent, No. 1,006,995, for an apparatus for holding the large mechanically drawn glass cylinders, which was fit for use when the cylinders were divided into segments, *held* valid as to claims 1, 2 and 4.

Appeals and Cross-Appeals from the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Suits by the Window Glass Machine Company and another against the Consolidated Window Glass Company, against the Pennsylvania Window Glass Company, and against the Kane Glass Company, which were consolidated. From a decree for complainants, but which denied some of the relief sought, the several defendants appeal, and complainants assign cross-errors. Modified and affirmed.

Marshall A. Christy and Robert D. Totten, both of Pittsburgh, Pa., and Charles Neave, of New York City (James I. Kay, of Pittsburgh, Pa., and A. W. Bright, of Washington, D. C., of counsel), for appellants.

Clarence P. Byrnes and George H. Parmelee, both of Pittsburgh, Pa. (Livingston Gifford, of New York City, of counsel), for appellees.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns window glass, a product which enters into practically every home and structure in the country. It covers a great pioneer step in this universal art, when to its customary and time-used method of blowing such window glass by human skill, "man-blown glass," there was added the mechanical exactness and increased production of "machine-drawn glass." That step gave to a machine and a mechanical process the equivalent of the fine skill of the most skillful of artisans, and of artisans who dealt with the most difficult to handle of products, viz., molten glass, which was changing its nature every second it was handled. This step freed the window glass art and its universally used product from the absolute domination and monopoly of a small body of skilled artisans, whose organization absolutely controlled its operation and the amount and price of its output. This change enabled some 70 ordinary mechanical employés, with the help of machinery, to produce the product theretofore made by substantially 600 blowers, whose exacting work was often done at the expense of their health, for the glass-blower's work, with its abnormal lung expansion, often caused physical decline. This change also brought about a decreased price of a universally used product. The machine-drawn output is now two-thirds of the window glass product of the United States, and this machine-drawn process and apparatus have been such that within a few years after they began in the latter country they have been adopted and used in England,

France, Germany, Austria, Italy, Russia, Spain, Portugal, Japan, and also in Canada.

The width of the change from the hand-blown process of the old era to the machine-drawn process of the new, is best illustrated by a brief description of both. To make a square sheet, from which panes of window glass can be cut, it is necessary to have a cylinder or roller whose sides are of uniform thickness and whose length is about 4 or 5 feet. Such a cylinder, or sectional cylinder, must be then split or parted on a straight line through its entire length, and then placed, with such split uppermost, in a heated furnace. As the glass softens, the sides of the cylinder recede from this longitudinal split, and we have the rectangular sheet of glass desired, from which, after certain flattening, annealing, and cleaning processes have been applied to it, panes of window glass of appropriate size may be cut. The formation of such cylinders, or sectional cylinders, is the aim of both the hand-blowing and machine-drawing methods; but the blower could only make one cylinder at a time, and this of a length limited to say 4 or 5 feet, and a diameter of say 10 inches, while by the machine-drawn method a cylinder of say 38 feet in length and 38 inches in diameter, and capable of being cut into five or nine subsections or rollers, could be produced. In doing this, the blower used a tool called a blowpipe, which consisted of a hollow stem through which he blew, and a bell-shaped enlargement at its end, on which he manipulated the molten glass. Taking this blowpipe, a workman, called a "gatherer," first inserted the bell-shaped, heated end of the blowpipe into a pot or tank of molten glass, and rotated it so as to gather a small mass of such molten glass on such end. The pipe was then taken to the cooling tub, where the pipe shaft or stem was cooled, and the glass shaped or cooled on the surface. This operation was repeated three times, which gave to the mass successive layers of glass like the skin of an onion. The glass lump, which still remained plastic, was then shaped by turning it in a suitably cooled wooden or metal block having a shaped cavity. The blower then took the tool with the glass mass on its end, and blew in some air by his lungs, while still turning the mass in the blower block. This gave it a rough pear shape. The glass was then reheated in the "blow furnace," and the blower then swung the depending plastic mass in a trench, and while turning or twirling the pipe blew into it at intervals. By this operation, the size of the glass structure was determined by the air blown in, the glass being meanwhile elongated by gravity and the centrifugal effect of swinging, and at the same time the whole mass was kept symmetrical in form by twirling. During such manipulation the glass became too cold to work, and it was again reheated in the blow furnace, and again elongated by the intermittent steps of swinging, twirling, and blowing, until a cylinder of equal diameter and thickness through its entire length was formed. When this was done, the end of the cylinder or "roller" thus formed was heated in the blow furnace, and the closed end blown open. The roller was then laid horizontally on a horse or rack, and the blowpipe was broken or cracked off the one end, and the other or rounded end of the cylinder was then "capped off," or severed by wrapping around it

a thread of hot glass and touching it with a cold iron; the expansion by reason of the hot thread and the contraction by reason of the cold iron, resulting in a straight cut of the cylinder on a line at right angles with the horizontal length of the cylinder itself. These rollers or small cylinders, so produced by glass blowers, were, as we have said, from 5 to 6 feet in length, and 8 or 10 inches in diameter, and weighed about 20 pounds, though their weight in glass of double strength might run over 50 pounds. The rapid and skillful handling of this swiftly changing, molten mass, the difficulties and skill of manipulation, and the requirement that the finished product should be of even thickness throughout, manifestly necessitated work of the highest skill, coupled with great strength and endurance. This skill was of such a character that three years of apprenticeship was often required to learn it, even by a man who was familiar with the work incident to such blowing, and the workmen were so restricted in numbers and of such individual skill that they formed a labor organization which absolutely dominated that industry.[1]

A visit, at the time of the argument of this case, of the members of this court to a glass factory near Pittsburgh, showed them the machine-drawing method of making window glass. The extent of the operations of this factory, and the call for molten glass, were such as to necessitate the use of a tank to keep up the supply of glass required. This tank, of course, had nothing to do with the patents here involved; but, as a part of a practically continuous process from the raw material to the flattened sheets of window glass, we note that such a vital element as the tank and the process therein employed, for keeping up the continuous supply of glass, will be found described in the case of Siemens v. Chambers (C. C.) 51 Fed. 902, a case decided in this cir-

[1] "Q. What was the condition as to the labor organizations to which these blowers and gatherers belonged? A. At that time, there were, if I recall correctly, two labor organizations, both of them trying to outdo each other in arbitrariness. They formulated rules for the operation of your factory, which you were obliged to live up to. You were restricted in the amount of glass that your men should blow in the eight-hour turn. They were required to lay off a certain portion of each eight-hour turn. The number of cylinders they were allowed to make was limited, and the number of boxes of glass for the week's work was limited, and an excess production over the limit was punished by severe penalties inflicted on the workmen. But the shortage of men made the workmen very arbitrary. They wanted their glass cut in sizes which made them the most money, irrespective of whether these sizes were the sizes which the trade required. The larger the size the glass was cut into, the greater were the earnings of the blower and gatherer and flattener. In addition, a man could make more money, and make it easier, blowing double strength than single strength, and, while the normal requirements of the country were always considered to be about one-fourth double and three-fourths single, lots of factories, our own included, were producing between 40 and 50 per cent. double, instead of 25, because we could get double strength blowers when we couldn't get men who would blow the single. The business from a manufacturing standpoint was chaotic. Q. 15. How difficult was it to obtain membership in these unions? A. Both the unions enforced the rule that no one could learn the trade, could learn any of the trades, what is termed the four trades, the blowing trade, the gathering trade, the flattening trade, and the cutting trade, unless he was a father, son, or brother of a member of the union."

cuit, and in that connection it is in evidence in this case that one of
the beneficent effects of the installation and successful use of the ma-
chine-drawn process was to permit the use of the tank, and the sav-
ings and product increase due to that economical agent of effi-
ciency and to the use of which the glass blowers had always objected.
In this tank a huge bowl at the end of a long handle, which was sus-
pended by a chain from an overhead runway, was dipped into the tank
mouth and filled with molten glass. The dipper was then swung
around and the glass carried to a glass pot, from which the molten
glass was to be machine-drawn. It will here be noted that the use of
this pot, situate at some distance from the tank, was the method used
in this particular factory, while the alleged infringing method used,
and with which we are here concerned, consisted in working the molten
glass, not in a pot, but in a structure situated alongside of and drawing
its glass directly from the tank.

But, to return to the factory visited, it will be noted that the ma-
chinery by which this draw is there effected was centered in a plat-
form about 40 feet above the molten glass. This platform contained
the different mechanisms required, and had suspended from it the me-
chanical semblance of a glass-blower's tool. This tool was a hollow
pipe about 5 or 6 feet in length, at the bottom of which was a circular
piece of steel, the whole tool somewhat resembling a mushroom stem,
with the top or umbrella inverted. From a cage in front of the
mechanism, where the single operator, who controls the operation,
watched and operated, the drawing tool or bait, as it is technically
termed, was caused to slowly descend. As the cage or mechanism
was lowered along guideways which reached nearly to the pot, the
inside of the steel bait dipped into the molten glass, which entered
and filled the interior of the bait. As the bait had an interior edge or
knuckle at its lower part, a circular rim of glass was at once formed by
the molten glass coming in contact with the cooling steel. This solid
rim thus formed was the start and support for the drawing operation
which followed. As the bait slowly emerged from the pot of molten
glass, a cylinder began to form, in a shape resembling a great demi-
john; that is, first the neck, then the gradually expanding shoulders,
then the main or cylinder body proper, which slowly increased until
a diameter of about 38 inches was reached. As the "bait" continued
rising, a molten glass cylinder was slowly drawn upward from the pot,
and this cylinder, now 38 inches in diameter, slowly and majestically
was drawn upward and upward until it reached a height of about 38
feet. The slow emergence of these cylindrical walls of even thickness
from a bath of molten fluid, mounting to such a height, self-supporting
and changing gradually from fluid to plastic, then to solid, glass, im-
pressed one as a real, veritable miracle, as the great cylinder stood
erect, of predetermined thickness, and of clear transparency. It stop-
ped substantially 40 feet above the ground, supported by its own sides,
and those sides resting on a fluid bed of molten glass at its foot. We
stop at this point to place in a note in the margin[2] an extract from the

[2] "Q. When you began this investigation, what impressed you at first as
the main physical factors involved, or what particularly impressed you

testimony of Dr. Bishop, professor of physics and dean of the school of engineering of the University of Pittsburgh, who has admirably stated, not only the outward and visible features of the drawn-glass process, but the great range of occult and invisible functional elements which tend to make or mar such a process.

What shall be done with this immense cylinder? A cold bar of steel is run around the lower end of the cylinder, and it is at once cut off from the plastic glass, which falls back into the pot. We here note that the glass which falls back into the pot, and which is called the "aftermath," does not concern us in the present case; but the character of that aftermath and the conditions necessary for its treatment were matters which had to be reckoned with in effecting the industrial and economical success of the drawing process under consideration. A large hoop, padded with asbestos, is then run around the severed end of the cylinder. To this is attached an overhead line. The lower end of the cylinder is drawn out from the pot into mid-air, and as it is drawn out the cage, with the bait, is lowered until the great cylinder reaches a horizontal position. Then the bait is detached, and, although its weight is well up to 100 pounds, it is held suspended by the cylinder itself. The cylinder is then dropped into a long horse or supporting rack, which consists of upright stems having semicircular hoops at their upper end, which are so spaced as to support the cylinder when lowered onto them. At this point a workman takes a capping tool, and, be-

mainly in the operation? A. Well, the whole process, from the time they commenced to feed the glass into the enormous tank of molten glass until the time the process was complete. But to a physicist, who has been obliged to handle glass, and knows its brittle character and the strains that are produced in it, this drawing of a glass cylinder from a bath of molten glass strikes one as being really a marvelous performance. I recall very distinctly the first time I visited this plant and observed the bait lowered into the glass, and marveled at the ease with which the glass was fastened to it; and as the bait was drawn upward the tendency was to watch the bait and the attached glass cylinder and *see how soon it would fall down.* After I became accustomed to that, I then watched to see what was going on in the bath of molten glass. It naturally separated itself in this way: We have the molten liquid glass, then a zone that we might call the meniscus zone; then above this the plastic zone, where the glass is flexible and moves with the greatest ease, something like a leaf in the wind; above this plastic zone comes the setting zone; and then passes into window glass in the upper part of the cylinder. Now, I was impressed with the fact that the mechanical appliances must be quite remarkable, and there must be a very close correlation and co-ordination, not only between the various physical factors which enter into this, but between the eye and the hand of the operator and the machines which correlated these various factors. Q. You have referred to the physical factors involved in this process. I will ask you to state, from your study of these methods, what you consider to be the main physical factors involved. A. After a prolonged study of this subject, I decided that the main essential factors are: (1) The bath of molten glass. (2) Heating to maintain the glass in a liquid state at a proper drawing temperature. (3) Shielding the heat from the drawing point. (4) Chilling of the glass in the bath. (5) Surface tension. (6) Viscosity. (7) Flexibility of the glass in the plastic zone. (8) Homogeneity of the glass; and under this two subheads: (a) Uniform mass density; (b) uniform thermal density. (9) Symmetrical segregation of the glass at the drawing point. (10) Speed of draw, and its relation to the temperature conditions in the receptacle. (11) Relative air

ginning with the upper end of the cylinder, next the bait, caps or cuts the cylinder along the desired lines. These large cylinder sections are then moved away to separate horses or racks, and, after being longitudinally cut, are subjected to the treatment of flattening, ironing, annealing, and cleaning, which were followed in the course of the small single cylinders of the glass-blower's art. To those interested in the subject the number of the National Geographic Magazine of May, 1919, contains illustrations and descriptions of this process.

[1] The proofs in this case show:

First, that while the suggestion of machine-drawn glass had been made and was recognized in the literature of the art as early as the '50's, no practical method of machine-drawing window glass had been evolved in the 50 years following, and the highest achievement of the art and the only method of making window glass was the hand-blown process first described. Interesting, therefore, as these prior suggestions were, suggestive as they may have been, in practice they got nowhere. It therefore follows that the men who in 1894 began a systematic and costly campaign to draw glass by machinery were absolutely pioneers in that field, so far as accomplishment was concerned. It follows, also, that these prior patents, none of which solved the problem of machine-drawn window glass, should have no effect in anticipating, qualifying, or defeating the claims for patent protection of those whose subsequent effort actually produced machine-drawn window glass.

---

pressure within and without the cylinder and controlled by vent. (12) Strains: (a) Produced in the glass while drawing; (b) taking down strains. (13) Cool glass remaining in the receptacle at the end of the draw; that is, the aftermath. Q. Have you arranged any classification of the factors you have enumerated? A. Of course, these factors entered, with perhaps one or two exceptions, simultaneously in a drawing operation. But it is possible, I think, to perhaps systematize these somewhat roughly under four heads: (a) Factors affecting the glass in the receptacle; (b) factors affecting the glass during the drawing; (c) factors affecting the glass during the taking down; (d) factors preliminary to the next draw. Now, if you go back to these same 13 factors which I have enumerated, you can perhaps classify them somewhat under this arrangement: Under (a) "Factors affecting the glass in the receptacle," we have: (1) The bath of liquid glass; (2) heating to maintain the glass in the bath in a liquid state; (3) shielding the heat from the drawing point; (4) chilling of the glass in the bath; (8) homogeneity of the glass in regard to its mass density and thermal density; (9) symmetrical segregation of the glass at the drawing point. The factors which have to do with the cylinder that is being drawn—that is, the ones that come under (B)—are: (5) Surface tension; (6) viscosity; (7) elasticity; (10) speed of draw; (11) relative air pressure and vent control. The factors which enter during the taking down, under class (c) are: (12) Strains which exist in the glass due to the method of the formation of the cylinder, and those which are introduced by the method employed to take the cylinder down and lay it in a horizontal position. Those factors which are preliminary to the next draw—that is, class (d)—are those which result from the necessity of removing the cool glass remaining in the receptacle at the end of the draw. This involves either a new factor in heating, if the aftermath is to be melted back and refined in place, or if the device which produced the symmetrical segregation of the glass at the drawing point is to be removed, and a new one put in its place. *I want to be very clear that, in attempting to classify these, that does not mean that one class occurs, and then another class occurs, and so on, but practically all of these occur all the time during the operation.*"

Nor should these earlier, but abortive, attempts which resulted in absolutely nothing, shield and protect from infringement and accounting those who copied not the abortive failures, but the successful steps of the originators of machine-drawn glass.

Second, while, of course, many of the general principles on which the hand glass blower formed the cylinder, must in the nature of things be the same as those by which the machine formed the same cylinder out of the same material, yet it will be seen that the hand-blown art and the machine art are essentially different. In that respect, the trial judge below well said:

"While there are certain analogies between the hand-blowing and machine operation of drawing glass cylinders, the former having taught certain principles, as the regulation of the size of the cylinder by internal air pressure, and control of the thickness of the glass by elongation, yet there are many fundamental and vital differences between the two systems."

Third, the machine-drawn window glass is produced by one continuous, progressive operation. There is no reheating. The diameter and length of the cylinder are so different that it is evident that the magnitude of the article handled, the continuous operation in handling, and the size of the product produced, in themselves are factors indicating that the problems involved in this continuous process, their interrelation to each other, the elements of air distention, the glass heat, and its rapid changes, unite with many other factors to make the whole process so corelated and interwoven that each element or invention which contributes to the successful end cannot be considered as an isolated inventive act, but must be viewed from the standpoint of all the parts of an interrelated, corelated, combination whole. In that respect, the trial judge well said:

"It is, perhaps, true that few, if any, of the arts presented so many perplexing problems as the drawing of glass cylinders by machinery from a molten bath. These problems appeared at the very beginning of the operation, and rose up persistently all along the way. The inventor had to deal with elemental actions, forces, and properties of matter; with things in the nature of heat, cold, the properties of solids, liquids, and gases; heat applied to the glass, and cold applied to the molten liquid; the properties and physical constitution of the glass as it passed from the solid to the liquid condition, through the plastic condition up to the solid state again; the application of air under conditions of pressure, and under conditions of pressure varied by heat. He must consider the uniformity or nonuniformity of the temperature of the glass in the furnace at different places and at different times; the conditions under which the intense heat from the furnace must be guarded from the drawing point, and the systematic segregation of the glass at that point. If the draw is from a pot, the relation between the diameter of the pot and the diameter of the cylinder being drawn; the rate of cooling of the glass in the receptacle from which the draw is being made; the speed of the draw, having relation to the temperature conditions in the drawing receptacle, as well as in the cylinder being drawn; the action of the air on the cylinder, both within and without; the temperature of the air when admitted to the cylinder, and the heating effect on the air after it has been admitted; the regulation of the air pressure in the cylinder to procure uniformity of diameter and to eliminate the 'breathing' of the cylinder, with the resultant corrugations in the glass; the symmetrical heating during the draw to prevent the lateral movement of the cylinder, and the melting back of the aftermath or residuum between the draws; the surface tension of the glass, and the strains produced in the cylinder while forming, and while being taken down. These problems

were not only numerous and complex, but many of the difficulties were latent and were only located after repeated experiments and failures. When the difficulty had been definitely determined and located, the remedy had to be found."

The patient hearing and consideration of this case by Judge Thomson, and his able opinion in its many phases, lead us to feel that the foregoing extract from his opinion points out the proper attitude of a court toward the patents which have bridged the great chasm between the hand-blown and machine-drawn window glass, and to this admirable statement of Judge Thomson's we add that of Judge Pollock, who had these same patents before him, where he said:

"Considering then: (1) All the patents involved in this suit as unified in purpose to carry forward the process devised, or as mechanical aids essential to the conduct of such process, therefore merely incidental thereto; (2) that by the process involved there was accomplished for the first time the new and useful result of mechanically drawing glass cylinders from a molten receptacle of glass of such size, thickness, diameter of cylinder, and degree of perfection as to successfully compete with hand-blown cylinders in trade and commerce; (3) because of the far-reaching importance this old result accomplished in a new and hitherto unknown way, making it of the largest economic consequence, value, and importance in the trade and in labor saving —the patents covering the process must and should, I believe, be regarded of the highest importance and be accorded the largest degree of credit given by the law to patents; and (4) indulging in favor of the validity of the patents themselves these presumptions which arise in law from the admitted facts of this case, such as (a) the legal presumption as to the validity of the patents, (b) the creation of a new mechanical industry, (c) arrived at after years of ceaseless experimentation and investigation under great difficulties and at large expense, (d) in dealing with a product of nature of such delicate and fragile texture as glass, (e) wherein the operation carried through the process was the first to employ, regulate, and successfully control natural forces and devote them to a useful end, (f) at a time when such forces were little understood and progress was impeded at every step by latent difficulties, hard to discover and harder to overcome, all of which presumptions must be indulged in this case under the rules established in the adjudicated cases."

When we consider that this machine-drawn window glass process and apparatus were the outcome of years of courageous and original experimentation, and that in those experiments several million dollars were sunk, we can see that we are dealing not only with a great contribution to a great art, but with the creation of a new art, and that the steps involved are of a radical, basic, and pioneer character.

Turning, then, to the machine-drawn window glass process and the mechanism which we have described above and seeking to find the basic principles and locate the dominant factors involved therein, we may say that the general problem attempted was to mechanically and continuously draw from a body of molten glass a self-supporting cylinder of substantially uniform diameter and substantially uniform wall thickness, in size so much larger than the glass cylinder of the hand-blown art as to increase output and decrease cost. In approaching this problem of an art which existed only in contemplation, it is clear the inventors departed abruptly from the art of hand-blown window glass by ignoring certain principles and dispensing with certain agencies there regarded as fundamental and indispensable.

In the art of hand-blown window glass, the size and shape of the

glass cylinder or "roller"—the primary structure—were attained chiefly by resort to certain laws of nature. The cylinder, on being swung in the trench, was elongated by gravity; it was distended by air pressure from the blower; its symmetrical form was made and maintained by the centrifugal effect of turning and twirling. Rather instinctively the blower supplied the requisite quantity of air to effect distension; thereafter his skill merely supplemented the natural operations of centrifugal force and the law of gravitation. To the control and use of these natural forces, the hand blower applied his skill; without them, he could not exercise his skill, and he could not make glass. Gravity and centrifugal force were therefore the basic elements or agencies on which the art of hand-blown window glass was built.

In searching first for the problems of machine-drawn window glass, and then for the solution of those problems, the inventors in this case wholly discarded centrifugal force as a factor in maintaining symmetry in the cylinder. They obtained the requisite symmetry by mechanically causing the motions of the cylinder to be vertical and steady, instead of oscillatory and revolving. They also discarded the law of gravitation as a means for lengthening the cylinder. They not only discarded this natural law, but they proceeded in direct opposition to it by employing means to cause the cylinder, in its elongation, to arise from a molten glass base, instead of to descend from such a base. In a word, they substituted mechanical means for natural forces; and for the human element, by which air in varying volume was—instinctively, intuitively, or intelligently—supplied to the growing cylinder, the inventors also substituted mechanism. In thus dispensing with human intelligence or intuitions, and in proceeding, not only without the aid of natural forces previously relied on, but actually in opposition to them, the conceptions of the inventors were more than novel; they were audacious, and, being practical, they involve invention of the highest order.

In working out the conception of drawing window glass mechanically, without the aid of elements of the old art, the inventors found that the controlling agencies were: (1) Temperature of glass and air; (2) distending air; (3) speed of draw. Considering, therefore, these three basic factors and their subdivisions, let us turn to an examination of the inventive steps of those who contributed to final success—for manifestly, such a result could only be born of investigation—and see, first, whether such inventive efforts are embodied in the patents here in issue; second, what protection has been given that invention in the way of claims; third, are the features thus invented, and protected by claims, found in defendant's process and mechanism.

The real pioneers in this great advance were Lubbers, who was a glass flattener and inventor, and James A. Chambers, who was an experienced glass man and whose means were placed at Lubbers' disposal. Lubbers began his experimental work in 1894 or 1895, and interested Chambers therein. The hidden difficulties of the problem which confronted these daring men are well illustrated by the fact that Lubbers believed at that time he could put machine-drawn window glass on the market in three months, and Chambers was willing to in·

vest large sums of money on the faith of that belief. Indeed, the difficulties that were from time to time encountered by these two men were almost superhuman, and it was not until 1901, and after a million dollars had been sunk in experimenting, that they were able to draw cylinders 8 or 10 inches in diameter and only 5 or 6 feet in length; in other words, to do just what the glass-blower could do. And while the results were such as to encourage them to go farther, the stupendous difficulties confronting them are apparent, when it is considered that, with all this outlay of effort, inventive skill, and money, they were not able even then to produce machine-drawn window glass on a successful commercial scale. Addressing our attention to that period of development, let us consider in serial order the inventions made and the patents granted during that time in the three basic fields above stated, viz.: (a) Temperature of glass and air; (b) distending air; and (c) speed of draw.

Turning first to the basic question of temperatures, Lubbers was confronted with radically new conditions and problems bearing on heat, both of the molten glass in the pot before it was drawn and in the cylinder as it was being drawn. We say "radically different" because, while the hand blower had to meet varying heat conditions when he took his molten glass from the tank or the pot, the problem of the glass remaining in the tank or the pot no longer concerned him, and while, of course, he had to meet changing heat conditions of the mass he was handling as he progressively developed his cylinder, yet it will be observed the blower was able to apply heat anew three different times to the glass mass he was working, as the process advanced. In the case of machine-drawn glass, on the contrary, the maintenance and control of the necessary heat conditions was an absolute essential, not only in the glass being drawn, but in the pot, also, because the process was a continuous one, and the pot was continuously being drawn from. Hence the maintenance and control of heat in the pot was vitally essential to the success of a continuous process. In the same way, the maintenance and control of heat essential to drawing a cylinder were equally essential and became more difficult because the glass in the cylinder could not be subjected to reheating as the process went on. Lubbers, therefore, began with the tank, which was the necessary base of a continuous process, and devised something that was wholly new in the tank art, namely, a forehearth or sidewise extension, whereby the glass was withdrawn from the main body of the tank and segregated in a place where it could be conveniently handled in a continuous process. But, while the forehearth afforded a convenient means of reaching the glass, Lubbers found that the glass being removed from the intense regenerative gas heat of the tank became colder at the outside wall of the forehearth and hottest in the part near the tank itself. To meet such objectionable heat variations, three different agencies or processes were at various times devised, to wit, a turntable pot, a pot and kiln method, and the forehearth method already referred to; but, as the question of infringement here involved concerns the latter, the forehearth method alone, we restrict ourselves to showing Lubbers' contribution to that problem.

[2] In taking up this heat problem, as well as the other problems concerned in the case, it is to be noted that the inventions made involve, as stated by Judge Thomson in the extract quoted above, the unusual feature of first locating or discovering the difficulty to be overcome and its relation to the whole problem, before any inventive steps were taken to solve it. In other words, these patents involve, so to speak, two series of inventions: First, discovering the difficulty; and, second, discovering means to overcome that difficulty, for the proofs show that, while the mischief or difficulty was time and again seen in the broken or imperfect cylinders made, the complexity of the process, the many factors affecting it, and the difficulties incident to studying molten glass, all united to so obscure and confuse that it was impossible to locate the real cause of an objectionable result. To this temperature problem Lubbers' patent No. 702,013 for an apparatus for drawing glass, applied for September 28, 1900, granted June 10, 1902, was addressed. Without entering into a detailed discussion of it and its companion method patent No. 702,014, we may say that Lubbers therein disclosed drawing the glass from the forehearth of a tank furnace, and that the use of the forehearth necessarily required that some provision for the regulation of tank heat be made. To that end, Lubbers provided a heat shield and a water-cooled ring, for the purpose of securing symmetrical heating, symmetrical cooling, and symmetrical proper temperature generally, at the point where the cylinder was being drawn. The process and apparatus were wholly novel in use in the problem of machine-drawing window glass. The judge below found the claims here involved, to wit, claims 1, 2, 3, 6, 8, 9, 10, 12, 13, 15, 16, 17, and 18, valid. This apparatus patent was a companion to method patent No. 702,014. The judge below found claims 2, 3, 4, 8, 9, 11, and 13 valid, a conclusion in which we concur. He found claim 5, which is for "the method of forming hollow glass articles, consisting in drawing a hollow article from a bath of molten glass, supplying air to the interior of the article, and increasing the rate of air supply as the article increases in length, substantially as described," invalid, in that regard saying:

"It is undoubtedly true that the elongating cylinder gradually cools, causing shrinkage in volume of the compressed air, and that there is a gradual decrease in the amount of heat imparted to the air as the cylinder lengthens, thereby lessening the expansion. It is also true that to meet these conditions there must be an increase in the air supply as the cylinder lengthens. Plaintiffs claim that this conception, covered by claim 5 of this method patent, is new in the art. I cannot concur in this view, even if this broad claim is read independently of the specifications defining the invention, wherein the inventor declared that to keep the cylinder of substantially uniform size it was necessary to automatically control the air supply, so as to regulate it according to the length of the cylinder being drawn, and that the supply of air should be slowly and gradually increased during the drawing operation. That the diameter of the forming glass cylinder must be maintained by air pressure is an old and well-recognized basic proposition in the art of glass making. The glass-blower by hand was perfectly familiar with the principle. He knew that to enlarge the cylinder the air pressure must be increased, and to lessen it the pressure must be diminished. But he also knew, and put into constant practice, the principle that to maintain the cylinder of uniform diameter the air pressure must increase as the cylinder lengthens. Had he not known and practiced this principle constantly, the fine art of hand-blowing

window glass cylinders could not have developed. Without such knowledge no merchantable cylinder could have been blown at all. It was basic and fundamental in the art. That the hand blower might not have been able to assign the scientific reasons therefor is not important. He knew the principle and applied it. Those who attempted to do by machinery what the hand blower had done successfully for generations presumptively knew the fundamental principles upon which that art had been built."

In this conclusion we feel the court below was mistaken. The claim is limited to the process of drawing from a bath of molten glass, and the method claimed was in substance for supplying air to the interior of a machine-drawn cylinder and increasing the air supply as such drawn cylinder increased in length. The judge below found that the same thing was done in the manual drawing of the glass-blowing art. Possibly this is true. The blower may have instinctively supplied air as he found the need of air, but the proofs do not show that the blower so increased the air with the increase in the length of the cylinder. But in the hand-blowing of cylinders there was the additional potent factor of a swing, as well as the blowing, to maintain the diameter of the cylinder as it increased in length. No such swing, and therefore no such means, of cylinder lengthening by gravity exists in the machine-drawn process. It is evident, therefore, that Lubbers' method of meeting the difficulty was physically and functionally different from the hand-blower's method. It therefore seems to us that claim 5 should be held valid.

[3] In connection with the process patent, No. 702,014, Lubber was granted a divisional patent, No. 702,015, which showed the use, in connection with his shield in the forehearth, of floating rings; the ring and shield having a sealing joint whereby the surface of the glass within the ring is practically shut off or segregated from the surrounding heat. This apparatus was protected by six claims, all of which were found novel and inventive in character by the judge below, a conclusion in which we concur. We are not unmindful that the use of floating rings in tank furnaces was old, but in the tank furnace they floated generally over the whole glass surface, and their principal function was not to segregate or protect from heat, but to keep the glass within them free from objectional substances. But Lubbers used them in a different way, in that they were necessarily confined to one place, and that place was in the forehearth, and they were used in connection with shields which he also devised, and their use was here for the purposes of heat control alone.

[4] Turning next to the problems relating to the regulation of air and the solution thereof, we note that claim 5 of patent No. 702,014 was an air problem, and under the order of discussion pointed out earlier in this opinion, would regularly be discussed under this present head. Regarding that claim, therefore, as a part of this present subject, and as here discussed by reference, we next turn to Lubbers' patent, No. 886,618, for an air vent hole. The difficulty to which this patent was addressed was a fundamental one, and one which threatened to defeat the practical commercial success of the machine-drawing of window glass. The difficulty that arose from air pressure was that exceedingly slight variations led to the enlargement and corruga-

tion of the cylinder, which of course made it practically unusable. Efforts had been made to overcome this difficulty by means of mechanical valves, of which Lubbers' apparatus and method patents, No. 702,016 and No. 702,017, in which Lubbers essayed to meet the difficulty, are examples; but the air pressure was so light, and the necessity of adjustment so exact, that such mechanical valves had proved failures.

In this dilemma Lubbers made the simple and novel discovery that nature itself could solve the difficulty if an open vent was provided, and that such vent would automatically take care of air pressure, and would prevent corrugations and bumps, or breathing, as it was termed. In other words, that where an overpressure of air was passing down the bait stem such overpressure would find a safety valve in a continuously open vent located in the path of supply. It was a novel, daring, and original suggestion, and in our judgment went to the very heart of the success of machine-drawing. Indeed, the simplicity of the use of an open vent, which simplicity is cited as evidence of lack of invention, to our mind shows the high order of novelty and invention, in thus making use of a simple opening, instead of complicated mechanical appliances, in order to accomplish a really remarkable result. Substantially there is nothing to the patent except the vent, used in the connection it is; but that very simplicity, originality, and effectiveness of the use evidence a high order of invention in employing such a simple appliance to accomplish such a vital result. As to the invention, the patentee states:

"The invention also relates to the exhaust or relief of a small portion of the air supplied to the interior of the article during drawing, through a small hole which is opened by the operator after the forming of the cap, so that a constant opening is provided through which the excess air is passed out as it becomes heated within the article. This has been found desirable, especially in connection with the graduating valve by which the supply of air is controlled, since the small outlet prevents enlarging of the article during drawing which is otherwise liable to occur on account of variations of pressure in the cylinder."

The broad character of the invention was recognized by the Patent Office in awarding a generic claim such as No. 20:

"In glass-drawing apparatus, an air supply pipe having an open outlet for air, arranged to equalize pressure in the article being drawn, substantially as described."

This claim, and Nos. 21, 23, 24, and 26, were all found valid by the court below, a conclusion in which we concur.

[5] We have not overlooked the able argument of counsel that Lubbers was not entitled to this claim, by reason of certain proceedings in the Patent Office. The history of the proceeding was that Lubbers applied on May 21, 1903, for patent No. 886,618, granted May 5, 1908. At the suggestion of the Office, he later, and on a divisional application of that patent, applied for patent No. 1,020,920, and the claims noted above were filed on April 25, 1906, which, it will be noticed, is almost three years after the original application was filed. We have carefully considered the subject, and see no reason to feel

that this second application of Lubbers was not properly made, in connection with his original application. It was germane to it. The whole art was in a state of flux and experiment. New difficulties were being discovered, and it took time to locate what was the cause of these difficulties, as well as to devise means for meeting them. Certainly this whole matter of venting was an open, unsolved subject during this .experimental season, and we find no time we can place our hands on with definiteness when Lubbers had satisfactorily worked out this open vent solution, which time is more then two years in advance of his application.

[6] Turning next to the speed of draw, which we have found one of the basic elements of success in the process, we note the patent, No. 762,880, granted to James A. Chambers June 21, 1904, for a method. of drawing glass articles. The claims involved are:

First. "The method of shaping glass articles, consisting in drawing them from a glass bath and gradually increasing the speed of drawing through the drawing operation, substantially as described."

Second. "The method of shaping glass articles, consisting in drawing them upwardly from a bath of molten glass and gradually and automatically increasing the speed of the drawing operation, substantially as described."

The court below found the two claims invalid. Our study of this art brings us to a different conclusion. It is, of course, clear that it is a self-evident fact that the faster a draw of molten glass is made the thinner the resultant article, and, of course, the slower the draw the thicker the glass. But from the time these experiments were begun by Lubbers no one seems to have thought of applying that general principle in a practical way to the new art of drawing that was being experimentally developed, until Chambers, who was a practical, experienced, and pioneer operator in glass, suggested his solution. Chambers' account of the art that Lubbers had up to that time developed in blown articles, and his remedy, are set forth in his application. He says:

"My invention relates to the drawing of glass articles from a molten bath, and is designed to increase the output of drawing machines and to make the thickness of the glass more uniform throughout the cylinder or article being drawn. Heretofore in the drawing of cylinders and similar articles from receptacles containing a molten glass bath, the bait has been drawn upwardly at substantially the same speed throughout the drawing of the article. In such cases, especially where a cylinder is drawn two or three times the length of a roller, the glass of the lower portion of the cylinder is thicker than that in the upper portion. I have found that this difference in thickness is due to the gradual chilling of the glass in the bath, the glass gradually growing stiffer through the time occupied in the drawing operation, and that by gradually increasing the speed of the bait during the drawing operation I can reduce the time occupied in drawing and produce the article having a more uniform thickness of glass throughout its length."

Chambers disclosed a practical method of employing his principle by the use of a conically shaped drum, rotated at uniform speed. The drawing began when the line was around the small end of the conical drum, and as it proceeded the successively larger portions of the drum over which the drawing line passed automatically increased the speed at which the bait was drawn upwardly. Chambers' method solved a

real difficulty, and his principle of difference in speed drawing made it possible, even with the molten glass growing stiffer, to make the entire length of these great cylinders more uniform in thickness. It will, of course, be seen that the application of this speed principle to the mechanical process of drawing from a molten bath was novel, for, while the abstract principle of difference in speed as affecting thickness was known, an experienced man like Lubbers, confronted by failure of his valuable principles and patents by reason of the nonuniformity of his cylinder walls, had not thought of any practical application of that principle to keep his cylinder walls from thickening as they were drawn. His cylinders were becoming longer, but with the longer cylinder came the thickening of the glass. It was then that Chambers stepped in and applied the old, but unthought-of, principle to this new process, which was a drawing and not a blowing operation. Lubbers had formed the cylinder initially by blowing. He was getting a longer cylinder, but the increase in length was accompanied by an increase in thickness, and it was at this point that Chambers, by speeding up the drawing, helped to save the process from failure. The claims involved the limitation of drawing from a glass bath. It was to the drawing art that Chambers applied in a novel way the principle, and contributed his important part in making the entire drawing system a success.

Conceding that the blower had a conception that the longer his article was made the thicker it became, we find no reason therefrom to minimize what Chambers did. The blower was dealing with a fixed quantity of glass, and he had a fixed thickness to get from that limited quantity of glass. He had the benefit of a swing to thin his glass as he operated it, and it was his practice to subject it to heat three different times during the blowing process. In the machine-drawing method, the problem was essentially different. There was no fixed quantity of glass to be operated on, but a pot filled with a molten mass which was liable to be drawn in thinner or thicker form, according to its heat. There was no method of recharging or reapplying the heat. The factors, therefore, which confronted Chambers in the drawing art, were altogether different from those of the blower, and Chambers met the problem by drawing small quantities of molten glass into the cylinder zone during the earlier stages of the operation when the glass was at a higher heat, and compensated for the loss of heat, and the consequent larger thickness of glass drawn, by a more rapid drawing, which became rapid automatically, during the latter stages of the operation. It was a simple, novel, and effective means of meeting the difficulty. It was one of the links that made a chain of success possible. We are of opinion Chambers' patent was valid.

[7] The orderly consideration of the speed of drawing next brings us to consider the patent to Lubbers, No. 822,678. Chambers, as we have seen, in his patent just considered, had shown how the body of a long cylinder, which was to be cut into rollers, could be kept of uniform thickness while the draw was going on by gradually and automatically speeding up the draw of the cylinder walls themselves. But, in addition to the necessity of regulating the draw of the main body of the cylinder, difficulties developed themselves in the cap at the

top of the cylinder, and also in the lower part of the cylinder, just over the molten mass. These difficulties arose as an attempt was made to draw cylinders of longer length, for when such longer cylinders were attempted to be drawn it was found that the cap which had to support the whole weight of the cylinder gave way under the strain. Lubbers' solution of that problem was to use three speeds in the operation:

First, a low speed in drawing the cap. Regarding this feature, Lubbers says in his specification:

"I have also discovered that by using the lower speed in starting the drawing of the cylinder I can draw cylinders of a length equal to at least two or three of the cylinder rollers which had previously been blown by hand. I can thus draw a cylinder of several times the length of an ordinary roller, and then sever the cylinder at an intermediate point or points, to give rollers of a length desirable for flattening and working up."

It will thus be seen that the strengthening of the cap by slow drawing was an important factor in the development of the new art of drawing very long cylinders. Of the drawing of the main cylinder body, Lubbers says:

"In drawing cylinders with this form of apparatus, the blowpipe is lowered into the bath and causes the glass to adhere thereto, and the pipe is then drawn up with a small amount of air admitted to form a neck portion 7. More air is then admitted to swell out the glass being drawn to the size of the cylinder desired, thus forming what is called the 'cap.' During the forming of the neck and the cap, and during the first part of the drawing of the cylinder proper, the drawing frame is lifted at slow speed by suitably controlling the fluid passed to the motor or in any other desirable manner."

Second, in drawing the main body of the cylinder, Lubbers speeded up the draw, preferably gradually, all of which were, of course, features also shown by Chambers. He says:

"After the cylinder proper is started, the speed of the drawing frame is increased, preferably gradually, until it reaches the full normal drawing speed, which may then be continued until the complete cylinder is drawn of the desired length."

When the end of the cylinder proper was reached, and it was desired to form the cylinder end which dipped into the molten glass, and which was to be "capped off" eventually from the main cylinder body, Lubbers suggested that this cap or end should be drawn thin, so that it might be easily sheared or cut off and dropped back into the molten mass. To do this he changed to a third and still higher speed, saying in his specification of that operation:

"The speed is then increased to a considerable extent, such as to draw a thin portion of glass at the lower end, which may be easily severed from the glass in the tank by shearing, cutting off with the flame, or otherwise."

Referring to these three relative speeds, Lubbers points out his method of use as follows:

"The relative speeds which I prefer to employ are about as follows: If the motor gives about 100 revolutions per minute in drawing the first portion, I preferably increase this to about 600 revolutions in drawing the major portion of the cylinder length. The speed at the end to thin the glass is preferably

much higher, preferably about 2,400 revolutions per minute. The speed which I have employed during the main drawing operation is about 30 inches per minute, with 600 revolutions. After cutting off, the drawing frame is lowered and the glass removed in the ordinary manner. By this method the cylinder is made stronger and thicker in the upper part, so as to support a long cylinder without breaking, and the change from the slow speed to faster speed is preferably gradual, so as to prevent excessive jerks which would injure the cylinder. I am thus enabled to draw a cylinder of at least two or three times the length of an ordinary hand-blown roller, which cylinder I then crack off at an intermediate point or points and cap off at its ends, thus forming several glass rollers or cylinders, which are cracked longitudinally and flattened in the ordinary manner. By thus drawing a cylinder of more than ordinary length, I am enabled to increase the output and cheapen the product."

It will be observed that the gradual increase of speed during the second, or cylinder proper, process, was not original with Lubbers, but was disclosed by Chambers. But Lubbers proposed to use in combination with this second or main cylinder body drawing, and to use in one continuous operation, a lower speed in making his upper cap and a higher speed in making his lower cap, with the practical and commercial result of making the long cylinders, without which the process would have been a commercial failure.

The claims here involved do not cover the second or Chambers method, standing alone, but only in combination with the lower speed in forming the upper cap, which elements are embodied in claims 1, 2, 3, and 6, or in combination with the forming of the upper cap at lower speed and the lower cap at higher speed, which elements in combination are embodied in claims 5, 7, and 8. In connection with both the slower speed in the upper cap and the higher speed in the lower cap, this particular Lubbers patent showed new combinations which the lower court found were valid, a conclusion with which we concur.

[8] We have already seen that the problem of obtaining cylinders of substantially uniform thickness was effected by positive controlling agencies which involved (a) temperature, (b) the distending air, and (c) speed, and the patents on these separate elements have already been discussed. But in addition to these positive controlling agencies, which had to be devised, the development of this art disclosed serious and obscure other difficulties of apparently an inexplicable nature, which had to be eliminated, overcome, or neutralized. For example, the natural thing, of course, was to let the bait drop into the center of the pot and draw the glass from that point, but for some inexplicable reason it was found in practice that the cylinder as it was drawn began to shift from this central position in an unaccountable way, with the result of producing glass of uneven thickness on opposite sides of the cylinder. This difficulty was finally located, its cause explained, and the trouble caused thereby overcome by Lubbers in his patent No. 914,588. Briefly stated, Lubbers found that the cooler portion of the molten glass has what is called a surface tension, or draw, of greater power than the hotter portion, and the tendency of this cooler and stronger portion was to shift the location of the bait from the center

of the pot toward such cooler surface. Referring to this difficulty, in his patent Lubbers says:

"In such drawing operations it has been found difficult to make the glass of the same thickness in the different portions of the circumference of the hollow article. * * * The glass thus drawn is often of the 'thick and thin' variety. This forming of thick and thin portions during the drawing operation is not only objectionable on account of the variations in thickness, but it causes a large amount of breakage, both during the drawing and the subsequent treatment. It also injures the quality of the glass, by making it very difficult to flatten properly, where cylinders are formed producing waste in cutting, and sometimes prevents cutting the glass in the desired way."

The cause of this shifting Lubbers explains in his patent as follows:

"I have found that where the glass is fed into a receptacle, for example, a refractory pot, the glass may be of a different temperature and stiffness in one portion of the pot from that in another portion, and the heat of the pot may vary in different parts thereof. There may also be variations in the character of the pot material in different portions of its walls, and other causes also lead to a difference in the surface tension in different parts of the article being drawn. I have found that, by adjusting the pot and drawing mechanism relatively to each other, I can reduce and avoid these difficulties to a large extent. With proper care in the adjusting, I can practically eliminate thick and thin glass and its consequent difficulties and objections. The importance of this will be understood when it is considered that in changing shifts of men all of the conditions surrounding the feeding of glass into the pot and the drawing operations are changed. These operations still depend to a considerable extent on the skill and familiarity of the workmen. For example, if the glass is ladled from the tank into the drawing pots, one operator may become accustomed to ladling the glass from a portion of the bath which is at a certain distance from the wall of the tank. His successor on the next shift may be accustomed to ladling from a different point in a different manner and under other conditions. For these reasons, it has been found that, where the drawing was proceeding in the proper manner with one ladler, it might draw in an entirely different manner with the next ladler. For some time it was not understood what caused this difference, which led to such important variations in the drawing of the glass. I have found that, by adjusting the pot and drawing tool or bait relatively to each other in a lateral direction, I can to a large degree compensate for these differences, owing to individual peculiarities in the workmen, and with proper care can practically eliminate thick and thin glass. Similarly, I can overcome the troubles arising from variations in the heat conditions and material of the pot."

To overcome these difficulties, Lubbers devised a simple drawing apparatus, by which the bait was made adjustable in lateral directions. When it was found that the bait and the cylinder were being drawn to one side by surface tension, he started the next draw a corresponding distance away from the center, so that the effect of the surface tension was to center the draw in the center of the pot and thus make a cylinder of uniform thickness. Speaking of his apparatus and of its method of use, Lubbers says:

"I thus obtain two horizontal adjustments at right angles to each other, by which I can bring the blowpipe or bait to any desired position relative to the walls of the pot. If, on starting a shift, it is found that the glass is drawing thick and thin upon a pot, I loosen the adjustable screws for the blowpipe support of this pot, and shift the position of the blowpipe to compensate for the differing conditions of tension at the different parts of the

surface of the bath. For example, if the glass is of a lower temperature at one side of the bath than at the opposite side, the blowpipe will be moved toward the hotter side. The cooler and stiffer portion of the glass will have a greater surface tension than the hotter portion, and consequently by moving the blowpipe toward the hotter portion I can compensate for this difference in the condition. Similarly, if the cavity or wall of the pot is hotter on one side than the other, thus giving more heat to the glass, I move the bait correspondingly. It is found in practice that, by adjusting the position of the bait or blowpipe relative to the walls of the pot, the difficulties in drawing thick and thin glass are practically overcome. In practice this adjustment may be needed when a shift is changed, or it may be needed even while the same workmen are operating the apparatus. The occasion which calls for adjustment is easily recognized, and with a little practice the mode of adjusting is easily understood."

This surface tension patent, three claims of which, claims 5, 6, and 7, are involved, the court below found valid, a conclusion that commends itself to us, for we feel that the location and discovery of this obscure phenomenon was a matter of great originality and value, and its solution, by the simple compensating, self-adjusting mechanism which Lubbers devised and covered by the claims in question, was a very material element in the success of the whole art of the successful machine-drawing of window glass.

[9] In addition to the difficulties that arose and which had to be overcome in the drawing of the cylinder from the pot center, all of which elements have been considered in the foregoing patents, difficulties were also encountered and had to be overcome in the treatment of the cylinder after it was drawn, namely, in getting it into a position where it could be handled and cut into rollers, and also in the apparatus, for properly cutting it into rollers. The cutting of the upper cap off the cylinder, and the cutting of the cylinder body itself into rollers of proper length, was accomplished by the device of Hitner for capping off glass cylinders, disclosed in his patent No. 821,361, which was applied for March 6, 1905. It is, of course, true that previous to Hitner's device cylinders had been capped off by means of an electrically heated wire. This wire was held in stationary position and the glass was moved toward it. This resulted in considerable waste, and the moving of a large cylinder in this way was obviously objectionable. Hitner devised a tool made up of a small heated wire of metal, of high electrical resistance, and of sufficient length to encircle the glass cylinder to be capped off. The leading-in wires were made flexible, so as to allow free movement of the device with relation to the stationary cylinder, and one of them was provided with a switch on the handle, by which an electric circuit could be made or broken, as desired by the operator. By the use of this device, the operator could loop the wire around the glass cylinder, and its free end passed around a roller held by the finger or thumb of the operator. When the switch was turned on, the current rapidly heated the encircling wire, which heat was communicated to the cylinder and caused the narrow zone of glass near it to expand. When this heated ring of glass was tapped by a cold steel tool, the glass parted on the line spanned by the wire. The court below, however, found the patent

was invalid, because it had been placed on sale more than two years before the application.

A study of the case has brought us to a different conclusion. As the application was filed on March 6, 1905, such sale and public use must have been prior to March 6, 1903. This would be during the period when the work of devising a window glass drawing machine process and apparatus as a successful whole was in an experimental state, both at Alexandria and at Gas City. Now, while the capping machine of Hitner was in substantial form the same from the start, and while it operated in the same way then as now, nevertheless we are convinced that at the time these machines were devised and made by the Doubleday-Hill Electric Company for the American Window Glass Company, and were paid for, that under the peculiar circumstances of this case said machine was still in an experimental stage, and such sale and use was not a public one in the sense of the statute. In the first place, the operations at both places were of a most secret nature. The machine was not made by the Doubleday-Hill Electric Company and sold to the American Window Glass Company in the ordinary commercial sense, but the American Window Glass Company, in order to have some electrical work, which it was not able to do itself, done by competent people, arranged with Doubleday-Hill Electric Company to furnish them with the services of Hitner, one of their employés. During the course of this employment, Hitner devised the capping machine, and it was constructed by Doubleday-Hill & Company, his employer, under the orders and at the request of the American Window Glass Company. In substance, we regard the making of the machine as having been made really by the American Window Glass Company. But not only was this the case, but its use was not a public one. The plants were closed and the operations carried on in the most carefully guarded way. Moreover, while this device was used, its use was wholly experimental, for success had not been reached in the manufacture of long cylinders, and the breakage and failure of the experiments up to that time were charged, inter alia, to this very Hitner capping device. It had not then justified itself, and its success and its freedom from blame for the troubles that undoubtedly then existed in the successful manufacture of long cylinders were not such as to warrant an application for it as a device which had passed the experimental stage. We are therefore unable to agree with the conclusions of the court below that Hitner's patent was invalid. On the contrary, we find that it was inventive in character and applied for in due time.

[10, 11] What we have said in a general way as to this patent of Hitner applies to his patent No. 822,452 for a hoist. As stated earlier in this opinion, after the cylinder was drawn and swung out to a horizontal position in mid-air, it was lowered and cushioned on a long horse or stand that stood on the floor. The proofs in this case show that as the development went on several devices were tried for supporting such drawn cylinder, but none were satisfactory. Lubbers sought to form such a rest, but his took too much time and it was

abandoned. Thornburg, also an experienced man, sought to solve the difficulty, but without success, and it remained for Bridge to develop an apparatus which had proved entirely satisfactory and for which patent No. 1,006,995 was granted him. Without entering into minor details, we may say that his device consisted of a series of upright standards provided with semicircular arms, which were made resilient by the use of springs supported on arms which extended from the standard to the crosspiece which supported the semicircular hoops on which the cylinder rested. The arrangement of parts was such that, not only was the entire cylinder safely rested upon all the semicircular arms of the device when the cylinder was lowered, but as each roller was capped off and parted from the remainder of the cylinder, not only was the capped-off roller properly supported by the semicircular arms on which it rested, but the remainder of the cylinder remained safely nested on the remaining semicircular arms of the device. This device was only perfected after much experimenting. We are of opinion, with the court below, that the device involved invention, was novel and useful, and the patent was applied for within two years of its being perfected. We therefore agree with the court below that the claims in controversy, claims, 1, 2, and 4, are valid.

Turning to the question of infringement, we note the fact that prior to the patents in suit there were no apparatus or methods in existence for machine-drawing window glass. It is therefore self-evident that the defendants' apparatus and method of machine-drawing window glass, which is a commercial success, was not drawn from the prior art. There is no evidence that it was originated by themselves. There is evidence that some of those who helped install their plants had formerly been in the employ of the plaintiff company, and knew of its methods. It is therefore quite reasonable to infer that the successful devices of the complainant must have had a material influence in formulating the methods and apparatus which the defendants followed and used. In view of this situation, we are not surprised to find that, taken as a whole, the defendants copied and infringed the plaintiffs' process and apparatus, and this copying is in the main so apparent, if the plaintiffs' patents are held valid, that the conclusions reached by the court below are self-vindicating. We therefore refrain from a minute discussion of the question of infringement, with the exception of referring to the principal and basic element of whether the defendants used a forehearth from which they drew their glass. In that connection, we may say that the defendants' furnace and its mode of operation are aptly described in the opinion of the court below, from which we quote as follows:

"The defendants' tank furnace at Hazelhurst, previously used for hand blowers, was rebuilt and changed in 1908 from the hand-blowing tank to the machine tank. As reconstructed, the working end was considerably widened, thus giving extensions of the main tank. The construction of the Kane tank is the same. These extensions were partially separated from the tank proper, by a series of piers, drawing places being provided in the side extensions by lowering the roof over the drawing positions of the bath, and providing covers near to the glass level in the extensions. The heat currents in the main bath were vertically cut off from those shielded covers by 'vertical shades' or

clay plates resting on the piers which extended down near to the glass level. As thus constructed, the depth of the glass in these side extensions was less than that of the glass in the main tank; the floor being elevated or built up. Being partially separated from the furnace proper by the piers, the heat currents in the main bath to some extent cut off by the vertical shades, the depth of the glass being less than that in the main tank, bounded on one side by an outer side wall and on the other joined to the hot glass in the main tank, from which the glass on the same level flowed to the drawing station, these extensions present all the characteristics of the forehearth. I have here attached transverse and longitudinal sections of the working end of defendants' furnace, showing the side extensions and drawing stations, being copies of Plaintiffs' Exhibit 68. Defendants' furnace structure is shown in a plaster model (Defendants' Exhibit 30), the correctness of which seems to be conceded, except as to the stepping down of the pedestals in the drawing holes, which is correctly shown in the drawings attached. Similar extensions were also built at the end of the drawing portion of the tank. Four gas burners for each drawing station, were extended through holes in the side walls; the two outer burners being at right angles with the wall, and the intermediate ones being pointed in a converging angle toward the draw. These burners perform the same function as the burners in the Lubbers forehearth. The heat above the glass at the drawing stations coming from these burners and that entering from the main furnace was shielded from the drawing point, first by a vertically movable clay cylinder lowered through the top stone, and later by this cylinder coacting with a floating clay ring. One floating ring was first used, then two, and finally three, for each drawing place. Before the draw began, a ring was pulled into place by the operator, and the cylindrical clay shield was then lowered to make a joint with the floating ring, which largely cut off the surrounding heat and also centered and held the ring in position concentrically under the drawing hole. The draw then began and proceeded slowly, no water-cooled chilling ring being then employed; the glass being chilled solely by exposure to the atmosphere. Later a water-cooled chilling ring was added inside of the clay ring to increase the chilling effect, thus greatly increasing the speed of draw and the amount of production. Later, by proportioning the width and depth of the water chilling ring so that it extended from the top stone down substantially to the floating ring, it was found that the clay cylinder or anchor ring could be done away with. Since then the drawing has proceeded within the floating ring and up through the water-cooled shielding and chilling ring, which was not protected by a surrounding cylinder. Except in unimportant details, the operations of the Consolidated, the Pennsylvania, and the Kane Glass Companies were the same. In some cases the water ring was tilted according to the judgment of the operator. Sometimes the water ring had small centering lugs, which held the rings a fraction of an inch apart, and sometimes these were cut off, in which case the rings set close together."

From a study of the proofs, of the drawings and models, we conclude that the defendants, who had been previously drawing their glass from a tank and the body of the tank, saw fit to change both the construction and the mode of operation of their tank. Their change in construction consisted in adding to the side of the tank, at its working end, side chambers, into which the glass flowed from the main body of the tank, so that in this way they received a continuous and full supply of molten glass. The roof of this side structure was lower than the tank roof. It was also shielded both from the direct effect of the burning of the generative gas in the tank proper and was measurably protected from the radiation of that heat, not only by its retired position and by its roof, but by the shields and heating-reducing devices employed in and about such side chamber. We are quite clear that this

side structure of the defendants, from which they drew their glass, was the functional equivalent of Lubbers' forehearth. It had all the functional features which Lubbers first pointed out to the art in his forehearth. It was automatically fed from the main body of the tank. Its heat was less than the main body of the tank. It used shields and cooling rings. It afforded a workable basis for drawing window glass cylinders, and its structure was such as to allow the control and modification of heat, which were essential to the success of a machine-drawing system. Its location and relation to the tank were such that, while this side structure got the benefit of the whole maximum heat of the tank and of the whole molten product of the tank, those operating it were enabled to use only such ranges of the maximum heat as they needed to maintain proper glass molten conditions, and yet were enabled to shield or shut off such portions of the tank as were harmful. In no sense of the word did the defendants in their reconstructed tank follow, either in function or physical effect, the old system of working from the tank proper; but they availed themselves in function and practice of Lubbers' forehearth in a modified form, which one of the plaintiffs' witnesses has happily called a "sheltered cove." We are quite clear that the judge committed no error in holding that defendants' side tank practice was an infringement of Lubbers' patents.

As to those features of infringement which the court below did not pass upon, we deem it sufficient to say that, in view of what we have already said on the general subject of infringement, we feel that, in addition to what the court below found infringed, we are justified in also finding that claim 5 of patent No. 702,014 to Lubbers, which we have before indicated was valid, was also infringed. We further find that claims 1 and 2 of patent to Chambers, No. 762,880, which we have before found valid, were also infringed. We also find that claims of the patent to Hitner, No. 821,361, for capping off glass cylinders, which we have heretofore found valid, were infringed. We also find the claims of patent No. 822,452 to Hitner, for a hoist, which we have heretofore found valid, were also infringed. We also find that claims 20, 21, 23, 24, and 26 of the patent to Lubbers, No. 886,618, for a hole vent, which we have found valid, were infringed.

With these additions and modifications, the decree of the court below will be affirmed, and in thus concurring in the conclusion reached by that court we place of record the fact that the work of the individual members of this court in understanding the complicated and difficult questions involved, in digesting the proofs, and in formulating their views have been greatly aided by the industry, patience, and research expended by Judge Thomson in the preparation of his able and exhaustive opinion.