## OKMULGEE WINDOW GLASS CO. v. WINDOW GLASS MACH. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. March 31, 1920.)

No. 5383.

Patents ☞328—For drawing window glass valid and infringed.

The Lubbers patents, Nos. 702,013, 702,014, 702,017, 822,678, 886,618, 914,588, and 1,020,920, the Thornburg patent, No. 759,329, the Chambers patent, No. 762,880, the Hitner patents, Nos. 821,361 and 822,452, the Schmertz patent, No. 890,306, the Frink patent, No. 988,454, the Bridge patent, No. 1,006,995, and the Maynard patent, No. 1,073,613, all relating to methods and machines for drawing glass, should each be viewed as a part of a completed whole, and as marking the successive steps in improving and developing the basic invention of Lubbers, resulting in processes and apparatus which have revolutionized the old art of making window glass and produced it commercially for the first time otherwise than by hand blowing. So considered, such patents were not anticipated, are valid, and are entitled to liberal construction as pioneer patents; also *held* infringed.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; John C. Pollock, Judge.

Suit by the Window Glass Machine Company and others against the Okmulgee Window Glass Company. Decree for complainants, and defendant appeals. Affirmed.

Arthur M. Hood, of Indianapolis, Ind., and Paul Bakewell, of St. Louis, Mo., for appellant.

Clarence P. Byrnes, of Pittsburgh, Pa., and Livingston Gifford, of New York City (George H. Parmelee, of Pittsburgh, Pa., on the brief), for appellees.

Before CARLAND and STONE, Circuit Judges, and ELLIOTT, District Judge.

CARLAND, Circuit Judge. This is an appeal from a decree holding valid and infringed claims 4 and 5 of letters patent No. 702,013, issued to John H. Lubbers, June 10, 1902, for improvement in apparatus for drawing glass; claims 5, 6, 8, and 9 of letters patent No. 702,014, issued to John H. Lubbers, June 10, 1902, for improvement in method of drawing glass; claims 7 and 8 of letters patent No. 702,017, issued to John H. Lubbers, June 10, 1902, for improvement in apparatus for drawing glass; claims 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 14 of letters patent No. 759,329, issued to Lincoln Thornburg, May 10, 1904, for improvement in glass-drawing apparatus; claims 1 and 2 of letters patent No. 762,880, issued to James A. Chambers, June 21, 1904, for method of drawing glass articles; claims 1, 2, 3, and 4 of letters patent No. 821,361, issued to Harry F. Hitner, May 22, 1906, for improvement in devices for capping off glass cylinders; claims 1, 2, 3, and 4 of letters patent No. 822,452, issued to Harry F. Hitner, June 5, 1906, for improvement in speed-controlling devices for glass-drawing machines; claims 1, 2, 3, 4, 5, 6, 7, and 8 of letters patent No. 822,678, issued to John H. Lubbers, June 5, 1906, for improvement in method of drawing glass cylinders;

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

claims 1, 4, 20, 21, 22, 23, 24, and 25 of letters patent No. 886,618, issued to John H. Lubbers, May 5, 1908, for improvement in apparatus for drawing hollow glass articles; claims 1, 2, 3, 4, and 5 of letters patent No. 890,306, issued to Louis R. Schmertz, June 9, 1908, for improvement in taking down apparatus for glass cylinders; claims 5, 6, and 7 of letters patent No. 914,588 issued to John H. Lubbers, March 9, 1909, for improvement in glass-drawing apparatus; claims 1, 2, 4, and 8 of letters patent No. 988,454, issued to Robert L. Frink, April 4, 1911, for improvement in glass pots or kilns; claims 1, 2, 3, and 4 of letters patent No. 1,006,995, issued to Richard W. Bridge, October 24, 1911, for improvement in horses for glass cylinders; claims 3, 6, 7, and 8 of letters patent No. 1,020,920, issued to John H. Lubbers, March 19, 1912, for improvement in method of drawing glass articles; claims 1, 2, 3, 4, 5, 6, 7, 13, 20, and 21 of letters patent No. 1,073,613 issued to Oliver E. Maynard, September 23, 1913, for improvement in glass-drawing and take-down apparatus.

Shortly after the decision of this case in the court below, the District Court for the Western District of Pennsylvania, in the case of these appellees against the Consolidated Window Glass Company, Pennsylvania Window Glass Company and Kane Window Glass Company, held the above or kindred claims of the Lubbers patents Nos. 702,013, 702,014, 822,678, 886,618, 914,588, and 1,020,920, and the Bridge patent valid and infringed. It also held the Chambers and Hitner patents and claim 5 of Lubbers, No. 702,014, invalid; said claim 5 and the Chambers patent being held invalid for lack of invention. The Hitner patents, except claim 3 of Hitner, No. 822,452, were found invalid, as being in public use and on sale. After the present case had been argued and submitted on appeal, the Circuit Court of Appeals for the Third Circuit affirmed the decision of the District Court for the Western District of Pennsylvania, with modifications and additions. 261 Fed. 362. The Circuit Court of Appeals, contrary to the decision of the District Court, held claim 5 of Lubbers, No. 702,014, claims 1 and 2 of Chambers, No. 762,880, claims of Hitner, No. 821,361, for topping off glass cylinders, and claims of Hitner, No. 822,452, for a hoist, valid and infringed. An application was made to the Supreme Court for a writ of certiorari to review the decision of the Court of Appeals, but this was denied. (Since the preparation of this opinion the case of Plaintiffs v. Smethport Window Glass Co. [W. D. Pa.] 266 Fed. 85, has been decided, and so far as applicable the decision is confirmatory of our views.)

Fifteen patents and 75 claims are involved in the present suit. The record consisted of 3,600 printed pages, and the briefs of counsel contain 400 pages each. The inclusion of so many patents in a single complaint would be an abuse of the privilege granted by equity rule 26 (201 Fed. v, 118 C. C. A. v), if it was not for the fact that all the patents in suit relate to a machine or process for the manufacture of machine-drawn window glass, and involve interrelated and interlaced problems. The defenses urged in counsel for defendant's brief are about 70 in number, and it is apparent that no detailed discussion can be made of all these defenses in a judicial opinion. The

evidence in the large record has been considered, as well as the briefs of counsel, and we shall proceed to state our conclusions as to the facts and law in as brief a manner as may be possible, in view of the learned and exhaustive opinions of the Court of Appeals in the Third Circuit, Judge Thomson in the Western district of Pennsylvania, and the learned trial court in the present case. In view of the discussion found in the briefs of counsel as to what the trial court said in its opinion as to the validity of any of the patents in suit when standing alone, we may remark that it is the judgment rendered by the trial court which is under review, and not the language used in its opinion. The basic subject-matter of all the patents in suit is machine-drawn window glass. As to the defense of noninvention it is necessary to consider how window glass was made prior to 1904; that being about the time a machine or process had been invented by which a cylinder of glass of the dimensions usual in the hand-blowing process could be drawn. The following is a fair statement of what the evidence shows as to the hand-blowing method:

"All window glass is made in the form of cylinders, which are later split open and flattened in a flattening oven. Prior to 1904 the cylinders were made by 'blowers' who used a hand blowpipe. The 'gatherer' inserted the bell-shaped heated end of this pipe in the melting pot or tank where the glass was made, and rotated it to gather a small mass on the hot pipe end. The pipe was then taken to the cooling tub, where the pipe shaft was cooled and the glass shaped and cooled on the surface. This operation was repeated several times, giving successive glass layers like the skin of an onion. The plastic glass lump was then shaped by turning it in a suitably cooled wooden or metal block having a shaped cavity and was then taken to the 'blower.' He blew in some air by his lungs, while turning the mass in the block, giving it a rough pear shape. The glass was then reheated in a 'blow furnace,' and the blower then began to swing the depending plastic glass mass in a trench, while twirling or turning the pipe at intervals and blowing at intervals. The glass was elongated by gravity and swinging, and the air blown in, and the mass was kept symmetrical by twirling. In a short time the mass became too cold to work, and it was then again reheated in a blow furnace, and again elongated by the intermittent steps of swinging, twirling, and blowing. When the blowing was complete, the end of the 'roller' thus formed was heated in the blow furnace and the closed end blown open. The roller was then laid on a horse and the blowpipe broken or cracked off. The rounded end was then 'capped off' or severed by wrapping around it a thread of hot glass and touching it with a cold iron. The 'rollers' or small cylinders so produced were from 5 to 6 feet long and 8 or 10 inches in diameter, weighing about 20 pounds. This work demanded the highest skill and great strength and three years' apprenticeship was required to learn it."

Prior to the patents in suit all window glass throughout the world was made by hand-blowing. This being the state of the art, there was invented a machine or process for making window glass by purely mechanical means. The Judges of the Court of Appeals of the Third Circuit had the opportunity of viewing the process of drawing glass by machinery, and Judge Buffington in delivering the opinion of the court detailed that process as follows:

"But, to return to the factory visited, it will be noted that the machinery by which this draw is there effected was centered in a platform about 40 feet above the molten glass. This platform contained the different mechanisms required, and had suspended from it the mechanical semblance of a glass-

blower's tool. This tool was a hollow pipe about 5 or 6 feet in length, at the bottom of which was a circular piece of steel, the whole tool somewhat resembling a mushroom stem, with the top or umbrella inverted. From a cage in front of the mechanism, where the single operator, who controls the operation, watched and operated, the drawing tool or bait, as it is technically termed, was caused to slowly descend. As the cage or mechanism was lowered along guideways which reached nearly to the pot, the inside of the steel bait dipped into the molten glass, which entered and filled the interior of the bait. As the bait had an interior edge or knuckle at its lower part, a circular rim of glass was at once formed by the molten glass coming in contact with the cooling steel. This solid rim thus formed was the start and support for the drawing operation which followed. As the bait slowly emerged from the pot of molten glass, a cylinder began to form, in a shape resembling a great demijohn; that is, first the neck, then the gradually expanding shoulders; then the main or cylinder body proper, which slowly increased until a diameter of about 38 inches was reached. As the 'bait' continued rising, a molten glass cylinder was slowly drawn upward from the pot and this cylinder, now 38 inches in diameter, slowly and majestically was drawn upward and upward until it reached a height of about 38 feet. The slow emergence of these cylindrical walls of even thickness from a bath of molten fluid, mounting to such a height, self-supporting and changing gradually from fluid to plastic, then to solid, glass, impressed one as a real, veritable miracle, as the great cylinder stood erect, of predetermined thickness, and of clear transparency. It stopped substantially 40 feet above the ground, supported by its own sides, and those sides resting on a fluid bed of molten glass at its foot. * * *

"What shall be done with this immense cylinder? A cold bar of steel is run around the lower end of the cylinder, and it is at once cut off from the plastic glass, which falls back into the pot. We here note that the glass which falls back into the pot, and which is called the 'aftermath,' does not concern us in the present case: but the character of that aftermath and the conditions necessary for its treatment were matters which had to be reckoned with in effecting the industrial and economical success of the drawing process under consideration. A large hoop, padded with asbestos, is then run around the severed end of the cylinder. To this is attached an overhead line. The lower end of the cylinder is drawn out from the pot into mid-air, and as it is drawn out the cage, with the bait, is lowered until the great cylinder reaches a horizontal position. Then the bait is detached, and, although its weight is well up to a hundred pounds, it is held suspended by the cylinder itself. The cylinder is then dropped into a long horse or supporting rack, which consists of upright stems having semicircular hoops at their upper end, which are so spaced as to support the cylinder when lowered onto them. At this point a workman takes a capping tool, and beginning with the upper end of the cylinder, next the bait, caps or cuts the cylinder along the desired lines. These large cylinder sections are then moved away to separate horses or racks, and after being longitudinally cut, are subjected to the treatment of flattening, ironing, annealing, and cleaning, which were followed in the course of the small single cylinders of the glass-blower's art."

We may add that this process is substantially the process shown by the evidence in the case before us. With the art of making window glass in the state it was prior to the patents in suit, Lubbers, in 1894, having shown James A. Chambers, one of the leading window glass manufacturers of the world, that he could dip a hand-blower's pipe in a bowl of melted glass and draw a hollow glass body upwardly by raising the pipe while blowing in air, started at Allegheny, Pa., at Chambers' expense, to experiment with the idea for the purpose of solving the problem of drawing mechanically and continuously from a bed of molten glass a self-supporting cylinder of substantially uniform diameter and substantially uniform wall thickness, in size so

much larger than the glass cylinder of the hand-blown art as to increase output and decrease cost. Consolidated Window Glass Co. v. Window Glass Machine Co., 261 Fed. 370, —— C. C. A. ——.

It is admitted by counsel for defendant that the evidence in the record shows that the problem of producing machine-drawn window glass was one presenting enormous difficulties. Lubbers thought he could put machine-drawn window glass on the market in 3 months, but 11 years elapsed and $3,000,000 was spent before this was accomplished. The first problems encountered by Lubbers in experimenting with actual molten glass were those which may be denominated bath problems; the "bath" being the molten glass contained in the melting pot from which glass cylinders are drawn. Some of the new factors which had never been met with in glass working were, first, working the glass into final solidified form while it was in a molten condition at a higher temperature than ever before so worked; second, providing the proper conditions of bath and draw; third, the factor of surface tension, a property of liquids, the molten glass being a liquid; fourth, taking care of the "aftermath" or colder glass remaining on and in the molten bath after the drawing of the cylinder. These general factors it may be seen at once distinguish the machine-drawn art from the hand-blowing process. Lubbers found that he must not only start drawing with a molten bath, but must apply heat to keep the glass in molten condition throughout the draw. This heat applied prevented the chilling of the molten glass to a plastic condition, which would stop the drawing operation. The heat of the bath passed out rapidly through the pot walls, and Lubbers found that he must preheat the clay pot, so that the glass would be ladled from the tank furnace into a highly heated pot, and also that the cooling of the molten glass in the pot must be checked by applying heat to the pot during drawing. He also discovered that this heat should be applied beneath the pot, so as to keep a hot body of molten glass beneath the surface of the bath, which surface was cooled both by exposure to the air and also preferably by added artificial cooling.

As to the second factor, Lubbers found that the heat which he applied by gas burners distributed around the wall of the kiln containing the pot would prevent proper setting of the glass in the wall of the rising cylinder. In order to overcome this, he conceived the idea of cutting the applied heat off from the drawing point by a shield. In the pot form, the pot form itself was utilized as the shield, by arranging it to coact with the roof or top stone of the kiln. In the forehearth form he used a separate vertically movable shield.

As to the third factor of surface tension, Lubbers discovered that he must maintain symmetrical heating and cooling conditions around the center of the draw; that is, in concentric circles around the center or axis of the draw, the temperature must be approximately the same in all parts of each circle. Surface tension is a peculiar phenomenon of liquids, inherent in their surface layer; and in molten liquids it changes with changing temperature. Hence, if the temperature at one side of the bath differed from that of another, the surface tension differed; and as a result the glass drew up thicker

on one side than the other, and the cylinder would travel across the bath, strike the pot wall, and pull in twain. By applying the heat in such a way as to keep the temperature of the glass approximately symmetrical, Lubbers overcame this difficulty.

As to the fourth factor, it appears that, as Lubbers was experimenting on intermittent cylinder drawing, he found that he must find some way of taking care of the "aftermath" left after a draw. As no one had ever drawn any cylinders, this was a new problem. Lubbers solved it by melting back the aftermath between the draws by means of heat applied on top of the glass in the segregated zone. In the pot form he lowered the pot, removed the water ring, closed the top hole by a suitable cover, and applied the heat of the burners to the top of the glass. It thus appears that there were two periods of what is called symmetrical heating: First, symmetrical heating during the drawing; second, symmetrical heating to melt back and refine between the draws. Lubbers was the first to apply heat during the draw and shield the glass from this heat, and the first to then remove the shield and apply surface heat to melt back the aftermath before the next draw. It appears from the evidence that the bath problems, both as to pot drawing and forehearth drawing, lay at the threshold of the cylinder drawing art. Until they were overcome, no further progress could be made because no cylinders could be drawn. These problems were actually discovered and solved for the first time in the art by Lubbers, the patentee in the main basic patents in suit.

After finding and solving these bath problems, Lubbers through the 6 or 7 years' work in Allegheny also met and solved many intricate problems connected with air distention of the cylinder, provided a practical form of drawing apparatus, and a practical method of taking down the cylinder when drawn. Knowing that it was impractical to blow with the mouth in any commercial drawing of cylinders by machine, Lubbers used a fan and a hand valve for control of the air. The results from this mode of supplying air were bad, the cylinders drawn being bumpy and corrugated, and it was difficult to determine the cause of this result. Lubbers believed for a long time that the bumpy, corrugated condition of the cylinders resulted from an uneven air pressure supply, and he therefore tried all kinds of air control devices, such as gasometers, reducing valves, and other appliances. He tried these both singly and linked up in series. He continued under this belief that the trouble was with un-uniform air supply until he practically exhausted the field of air control, then finally concluded that he had made the air supply uniform and that other reasons for corrugations and bumps were present. It was finally found that, even with uniform air, the entering air, becoming heated by the hot glass and consequently expanded, would swell out the cylinder, the operator would then naturally shut off some of the air with the hand valve, the cylinder would contract, the operator would then naturally open the valve, the cylinder would again expand, and so on, giving a series of bumps, which were intermingled and confused with the bumps resulting from other causes.

At this time the actual pressure in the cylinder was not known, and the discovery of the reason for the bumps was in itself a difficult and abstruse problem. After long experimentation, Lubbers began to see that, in the drawing of a cylinder between 5 and 10 feet long, the rate of air supply should be gradually increased and a more finely graduated device than an ordinary hand valve must be provided for enabling this increase to be gradually performed, as contrasted with sudden relatively large changes in pressure. For this purpose he finally devised the graduating valve shown in patents 702,013 and 702,-014, the long lever arm of which was gradually and slowly turned during the upward drawing of the cylinder. By these discoveries Lubbers separated the bumps caused by the naturally too coarse and large movements of the hand valve from the bumps now known to be caused by other factors. Without measuring the actual cylinder pressure, he finally realized that exceedingly small successive increases in pressure must be produced and carefully graduated during the drawing operation, and then discovered that a graduating device, whether worked by hand or mechanically, must be used to gradually and slowly increase the rate of air supply. At the present time it is known there are several reasons for the necessity of a graduated air supply, namely, the shrinkage in volume of the air in the cylinder, owing to its gradual cooling off as the cylinder elongates, and the gradual decrease in the amount of heat imparted to the air entering the cylinder as the cylinder elongates, causing lessening expansion of air, and, as these actions continue throughout the entire draw of the cylinder, they alone require a gradual increase in the rate of air supply throughout the draw, to keep the rising cylinder of the same general size or diameter.

Another very complicated question of air control was encountered by Lubbers in his longer draws at Allegheny. While the earlier patents in suit show only a single cylinder about 5 feet long, yet there were actually drawn cylinders from 8 to 10 feet in length. Lubbers found that after the first 4 or 5 feet there were successive swellings out and drawings in of the cylinder, which he termed "breathing." After the first 4 or 5 feet the cylinder seemed to act like the chest of a person breathing. The cause for this was unknown, and is not now positively known. The problem was discovered by Lubbers, and he decided that these breathing bumps were caused by some unknown natural law, and that they could not be handled by any instrumentality then known to him. He finally decided to try some means for cutting down these bumps. Thinking that they must be due to successive rises and falls in the pressure, he tried to relieve the pressure rises as they formed by cutting off the tops of the pressure bumps. The evidence shows that at Allegheny he tried two means for doing this; one being a light spring-pressed valve on the blowpipe as shown in patents Nos. 702,016 and 702,017, and apparently at that time was introducing air upwardly through a nozzle in the center of the pot. He also tried tapping a small open hole in the blowpipe, which could be closed and opened by inserting or removing a wooden plug in it.

The contents of the continuously open venthole patent, No. 886,618, would indicate that Lubbers first tried the open hole, then tried the spring-pressed valve, and finally went back to the open hole. For the latter he also used in Allegheny a brass pet-cock, as well as the hole closed with the wooden plug; but no final decision seemed to have been reached in regard to these pressure-relieving systems until what is known as the Alexandria period. It seems to be agreed that no one had ever discovered that the rate of air supply must be gradually increased in drawing a cylinder from the molten glass to keep the cylinder of the same size. The paper patent art at this time was simply to increase the air pressure to make a cylinder larger, or decrease it to make it smaller. The testimony shows that in the latter part of 1901, after some 5 or 6 years' continuous experimental work, and after the expenditure by Chambers and his associate backers of about $1,000,000, Lubbers was drawing single-strength cylinders of about the same size as hand-blown cylinders. Under this condition of affairs it was decided that an attempt should be made to draw larger and longer cylinders, for the purpose of increasing production and reducing the operating expenses to a point where competition with the hand-blown art might be possible. With this idea in view the parties interested began to rebuild and equip a plant at Alexandria, Ind., and installed some drawing machines intended to draw cylinders from 15 to 18 feet long from pots arranged in kilns. The experiment started in June, 1902. It was during the experimental work at Alexandria that the apparatus was designed to give three classes of speed in the drawing of the cylinders: (1) A slow class of speed for the neck and cap. (2) A faster class of speed for drawing the cylinder. (3) A still faster class of speed for thinning after the draw. Through the Allegheny period the entire draw was carried out at the same speed and consequently the cap of the cylinder was thinner than the class of the cylinder proper. In drawing long cylinders it was found to be essential to form the cap of thicker and stronger glass than in the caps for the lighter cylinders, and this was the reason for the idea of drawing the cap with a different and lower class of speed, and then shifting to another and higher class of speed in drawing the cylinder proper. It was also at Alexandria that Chambers made the discovery in the art of making window glass that, although heat was applied to the pot to keep the glass melted during the drawing operation, nevertheless the glass was cooling and growing stiffer during the drawing operation. This was not discovered at Allegheny, but became apparent in the long draws made at Alexandria, where it was observed that in the longer draws the glass grew gradually thicker. To overcome this difficulty Chambers devised a method which consisted in gradually increasing the speed of drawing by small increments during the drawing of the cylinder proper.

No one had ever conceived of actually varying the speed during the drawing of a cylinder where uniform thickness was desired. It remained, therefore, for Chambers to make this very original conception to overcome the gradual thickening. He conceived that, as

the glass was gradually chilling and gradually thickening, a gradual change of speed during the drawing of a cylinder body itself would overcome this trouble. It was at Alexandria, also, that the great difficulty of the long period of delay between draws was remedied, in the invention by Lubbers of what is called the three-pot turntable system in a heating kiln. It was also at Alexandria that Lubbers, in working to reduce the time between draws, discovered the idea of using the heat applied directly to the surface of the aftermath to melt it out of the pot, instead of melting it back in the pot. This was accomplished by the construction of a four-pot turntable, built and installed in the fall of 1902. In the four-pot turntable, the fourth added station was for draining, and was placed between the reheating station and the charging station. After the glass was heated at the reheating station, the pot came to the draining station, where it was tilted and the reheated glass was drained out under the further heat of the kiln applied to the surface of the glass. These structures devised by Lubbers were improved upon by the invention disclosed in the Thornburg patent, No. 759,329. The invention of Thornburg was the placing of two clay pots back to back mounted on trunnions, so that this double pot system could be turned over in a kiln.

Many different problems were met and solved at the Alexandria plant, among them those disclosed in the Hitner inventions, patents Nos. 821,361 and 822,452. In the winter of 1902 and 1903 the plant at Alexandria became so unsatisfactory that for this and other reasons a plant was started at Gas City, Ind., with Thornburg as superintendent. It appears from the evidence that the inventions made in the Allegheny period, while sufficient for the drawing of cylinders of single roller length, were far short of commercial success, and over 4 years more of continuous work was done after that before commercial success was attained. When commercial success was obtained, however, all of the basic inventions of the Allegheny and Alexandria periods had to be used. All the bath factors, the drawing factors, the air-controlling factors, and the speed factors are continuously acting upon the drawing; therefore the methods and devices for handling and meeting these problems must all coact simultaneously in correct relationship and proportion to each other, and it is one of the great difficulties of making commercially valuable window glass, with the different steps and devices as disclosed in the patents in suit, if these steps and devices are not properly proportioned and suited to each other. During the time succeeding the Gas City period, as well as before, one of the main troubles in the manufacture of window glass was the making of thick and thin glass, so far as the glass cylinders were concerned. Through the entire history of the attempt to draw cylinders by machinery the bait had always been centered in the pot at the beginning of the draw; that being considered essential. The cage support for the pipe had been made adjustable for this sole purpose and result, namely to center the pipe in the pot in spite of the shifting of the pot and kiln under varying heat conditions.

All through the Alexandria and Gas City periods and afterward

there still remained the great difficulty of "thick and thin" glass; that is, a cylinder having thicker portions and thinner portions. Lubbers was of the opinion that with the best that could be done in symmetrizing heat conditions it was impossible to accurately symmetrize the temperature in various parts of the bath. In his study of the matter he found that in drawing thick or thin glass the cylinder usually traveled over the bath, and finally discovered that this traveling depended on and flowed from certain differences in temperature, either in the glass of the bath or in the segregating wall or vessel, and that this caused differences in the surface tension of the bath. This difficulty seemed insurmountable, unless the heat conditions could be absolutely controlled and equalized. Lubbers finally solved this most difficult and complicated trouble by the simple idea of initially adjusting the bait to the one side of the bath in the opposite direction to that in which the cylinder was traveling. If the conditions were that the cylinders traveled toward one side of the pot, in drawing the next cylinder he found that by adjusting the bait in the opposite direction to that in which the cylinder had been traveling, and then starting the next draw, he could compensate for or neutralize this traveling tendency, and in this way compensate for or neutralize for the slightly varying heat conditions and obtain glass of substantially even thickness. In our judgment this was one of the great discoveries of the entire development of the machine-drawn art. This matter of surface tension and removing the difficulty of thick and thin glass was the final basic contribution by Lubbers to the making of successful cylinders.

During the experimental development the glass cylinders were taken down by hand, and it was left for Maynard patent, No. 1,073,613, to devise an apparatus which would co-operate with the drawing frame or cage in supporting the weight of the cylinder during the taking down of the same. This invention greatly reduced the danger to the workmen, as well as the labor in supporting and carrying the combined weight of the cylinder and bait. For this purpose he provided a cradle carried on a trolley movable on a track extending from the drawing apparatus over the supporting horse. In the use of the apparatus the take-down carriage is moved up the track to the glass cylinder which has been cut free from the bath. The cradle is swung back of the cylinder, the lower end of the cylinder is then pushed out manually by the cradle, while the latter is disconnected from its actuating rope, the rope clutch being at that time opened. Then, when the cable is started, it engages the clutch and moves the carriage with its contained cylinder outwardly. Thereafter the carriage is moved over the horse, and the horse supports are lifted up to engage the cylinder. Schmertz, No. 890,306, greatly improved the Maynard take-down by the idea of using a flexible overhead track, instead of Maynard's rigid track. This flexible cable track for the cradle trolley accommodated itself to the movements of the cylinder and reduced breakage.

We have thus gone over the experimental period, which finally resulted in a machine or process which manufactures window glass

in the manner detailed in the opinion of the Court of Appeals of the Third Circuit, supra, for the purpose of indicating in a general way the problems which were met and solved by Lubbers and his associates. Comparing the result accomplished with the hand-blown method, as both appear in this record, but one conclusion can be reached in regard to the question of invention, and that is that the discovery and solution of the problems which were met in the effort to invent the machine or process embodied in the patents in suit shows inventive genius of the highest order, and entitles the inventors to all the rights of pioneers in the art to which the patents relate. It is insisted by counsel for the defendants, however, that each one of the patents in suit must be judged as to its validity when standing alone, and that when so viewed none of them present anything new and useful in the window glass art. This question has been seriously and carefully considered by the court, as the general rule is that patents for a definite invention must stand or fall on their own disclosures. We find no case which in its facts is similar to the one at bar. Lubbers and Chambers and their associates, it must be admitted, started with the idea of inventing a definite machine or process for the manufacture of window glass. During the years of disappointment, trouble, and expense, with magnificent courage and faith, they never swerved from their purpose, and each patent in suit was applied for and received with the single idea of protecting the basic discoveries which were in the minds of Lubbers and Chambers when they started in 1894. What the inventors and their associates would seem to be entitled to by their patents as contracts between the people of the United States and themselves, made through the executive department of the government, is the exclusive right to use, vend, and sell for the term limited by law the machine or process which was finally perfected and which Chambers and Lubbers started in 1894 to invent.

The first patents in suit disclosed the first apparatus and methods by which cylinders of window glass were actually drawn from the molten bath for the first time in the world. The succeeding main patents disclosed the apparatus and methods by which for the first time a long and intricate series of troubles and differences in commercial glass drawing were overcome and the drawing of window glass cylinders for the first time made profitable in competition with hand-blowing. These differences arose in drawing long cylinders, in cutting down the time between draws, in avoiding thick and thin glass, in preventing breaking away at the cap or neck, in heavy pulsations and corrugations of the cylinder, reducing the enormous breakage, keeping the glass uniform in thickness from one end to the other, in capping off, and ease and rapidity of taking down. For the first time in the history of the world commercially successful window glass cylinders were now drawn from a bath of molten glass out of contact with any shaping surface; the cylinders simply growing up in the open air under the sole influences of bath control, air control, speed control, chilling and temperature control, and surface tension control. The ideas embodied in the patents in suit revolutionized the

old art of making window glass, if they did not create a new art. The manufacture of window glass was greatly cheapened and the price to the consumer was lowered, so that to-day two-thirds of the entire production of window glass in the United States is made by the machine-drawn method. The plaintiffs have used and are using the main features of the patents in suit and all improvements thereon. We therefore concur in the opinion of the Court of Appeals of the Third Circuit, supra, in that of Judge Thomson, and in that of the learned trial court below, to the effect that it is the duty of the court to view the patents in suit as involving interrelated and interlaced problems, which can be intelligently considered and the rights of the parties determined only in viewing them as a part of a completed whole.

As to the defense of anticipation, so far as the prior art is concerned, leaving out of consideration prior patents, we are satisfied with the language used by Judge Thomson in his opinion in the Consolidated Case, as follows:

"While there are certain analogies between the hand-blowing and machine operation of drawing glass cylinders, the former having taught certain principles, as the regulations of the size of the cylinder by internal air pressure, and control of the thickness of the glass by elongation, yet there are many fundamental and vital differences between the two systems. In the hand method, the ball of glass on the blowpipe is made up of successive layers; each layer being chilled before the next is applied. The ball is a plastic solid, differing much in temperature from the molten bath, is shaped before the draw is started, and has a heavy outer skin or layer. Instead of the cylinder being drawn upward from the stationary mass of molten glass, the glass is drawn away from the blowpipe by its weight and the centrifugal force caused by the swinging of the cylinder. The operations are not continuous, but intermittent and successive, elongating by swinging, swelling the cylinder out, reheating, blowing by puffs, etc. The problems of the liquid bath, with its varying temperatures and surface tension the differing zones of glass passing from the molten glass at the beginning, through the meniscus zone, the plastic zone, the setting zone, to the cold zone, all these are wanting in the hand-blowing process."

In regard to the prior patents, we concur in what is said by the Court of Appeals of the Third Circuit, in the opinion of Judge Thomson, and of the trial court. We only add the remark that the admission of defendant's counsel that Lubbers and Chambers had before them enormous difficulties when they started in to invent a machine or process for manufacturing window glass by mechanical means, and the evidence in the record of a struggle of 11 years at great expense is a strange commentary upon what the prior art actually showed, especially in view of the evidence that Chambers and Lubbers were experienced glass men.

We are satisfied with the reasoning of the Court of Appeals of the Third Circuit in sustaining Lubbers' patent, No. 886,618, for an air vent hole in the apparatus for mechanically drawn glass, filed May 21, 1903, and granted May 5, 1908, after the patentee on the suggestion of the Patent Office had later made a divisional application in that patent, by applying for patent No. 1,121,920, and filing nearly three years later additional claims for an additional patent; also the reasoning of the same court in sustaining the Hitner patents, Nos. 821,361 and 822,452.

A defense is made to Lubbers' patent, No. 702,013, that the vent hole was necessary in the original apparatus and was concealed. We do not think that this defense can prevail, as the evidence shows that the vent is not necessary until the cylinder is 8 or ·10 feet long, therefore there would seem to be no basis for defendant's contention, especially in view of defendant's defense of prior public use of the vent. During the time that the shorter cylinders were being drawn the vent was a subject of secret experimentation, and nothing definite and final in relation thereto was determined upon until longer cyl-inders were drawn.

As to infringement little need be said. The evidence shows that the defendant made practically a copy of plaintiff's apparatus and methods, and did so in an aggravating way, by hiring Westbury, plaintiff's superintendent of a factory, to build and operate its operating machines and methods. It even appropriated the "pot," instead of the "forehearth," method, which was keeping in closer touch with the plaintiffs than other infringers. The truth shown by the whole record is that the invention embodied in the basic patents in suit, and those patents which may be said to be in aid thereof, present such strong equities in favor of the patents that it would require something more than mere technical defenses to break down the case of the plaintiffs.

We have deemed it unnecessary to discuss more at length the questions involved, for the reason that they have been discussed by courts of eminent ability, and it would serve no useful purpose to again state what has already been so well stated.

Our judgment is that the decree below as to the claims in suit should be affirmed; and it is so ordered.